O

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| CASSANDRA PACE, | Case No.: SACV 13-00500 DOC(RNBx) |
| Plaintiff, | |
| vs. | |
| | **ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR CLASS CERTIFICATION [32]** |
| PETSMART INC. ET AL., | |
| Defendants. | |

Before the Court is Plaintiff Cassandra Pace's Motion for Class Certification (Dkt. 32). After considering the moving and opposing papers and the oral arguments of counsel, the Court GRANTS IN PART and DENIES IN PART the motion.

## I. Background

Plaintiff Cassandra Pace ("Pace") is a former pet groomer at PetSmart. PetSmart provides goods and services related to pet care. Pace is alleging that the following PetSmart practices violate California law: 1) issuing final wages on prepaid ATM Cards ("Money

Network Paycards") that do not meet California law requirements for payment under § 212; 2) not paying all commissions to employees within 72 hours of their resignation; 3) continuing to pay commissions after separation of employment without an itemized wage statement; and 4) paying employees at termination using Money Network Paycards without prior authorization (only alleged under PAGA).

### a. Plaintiff's Claims

While she was employed, Pace collected her pay from PetSmart by direct deposit.  When PetSmart terminated her employment around September 9, 2012, Pace was given her final wages on a Money Network Paycard.  Pace then incurred fees to access her wages.  She believes the card still holds $3 that she is unable to access.  Wages were added to the card more than three days after PetSmart terminated Pace.  *See* Pace Decl. ¶¶ 3-4.

Plaintiff's Second Amended Complaint ("SAC") alleges two class claims and several individual claims.  The first class claim relevant to this motion is that "Defendants violated Labor Code §§ 201-203 by, among other unlawful acts, issuing ATM cards as final payment of wages to employees who have been discharged and/or resigned."  SAC ¶ 38.  The second class claim is that "Defendants did not pay all commissions owed to employees at the time of their discharge or within 72 hours of their resignation, as required by Labor Code §§ 201-203."  SAC ¶ 38.

California Labor Code §§ 201 and 202 require employers to pay final wages to terminated or resigning employees promptly.  If an employer discharges an employee, wages earned and unpaid are due and payable immediately upon discharge.  Cal. Lab. Code § 201.  If an employee resigns, final wages are due and payable within 72 hours.  Cal. Lab. Code § 202.  If an employee gives at least 72 hours' notice, however, the employee is entitled to receive final wages at the time of quitting.  *Id*.  Under § 203, if an employer "willfully fails to pay" terminating wages according to sections 201 and 202, "the wages of the employee shall continue as a penalty from the due date thereof at the same rate until paid or until an action therefor is commenced."  Cal. Lab. Code § 203.  However, an employee "who secretes or absents himself or herself to avoid payment to him or her, or who refuses to receive the payment when fully

tendered to him or her, including any penalty then accrued under this section, is not entitled to any benefit under this section for the time during which he or she so avoids payment." *Id*.

Plaintiff also brings class claims for violations of California Labor Code §§ 212 and 213. Under § 212(a), an employer may not pay wages in any way that is not "negotiable and payable in cash, on demand, without discount, at some established place of business in the state, the name and address of which must appear on the instrument . . ." Cal. Lab. Code § 212(a).  An employer also may not pay wages using "[a]ny scrip, coupon, cards, or other thing redeemable, in merchandise or purporting to be payable or redeemable otherwise than in money." *Id*.  Under § 213, an employer may pay employees by "depositing wages due or to become due or an advance on wages to be earned in an account in any bank, savings and loan association, or credit union of the employee's choice with a place of business located in this state, provided that the employee has voluntarily authorized that deposit." Cal. Lab. Code § 213.

Pace argues that §§ 212 and 213 require an employer to obtain an employee's voluntary authorization before paying the employee his or her wages with an ATM card.  Pace also alleges that the ATM card must be negotiable and payable in cash, on demand, and without discount at established businesses in the State of California.  Pace argues that PetSmart issued its employees final wages in the form of an ATM card without their consent, which required that employees incur fees to use, was not fully cashable, and was not usable at all financial institutions.  The California Division of Labor Standards Enforcement ("DLSE") has issued opinion letters regarding the compliance with the Labor Code of other payroll debit card programs, similar to the one at issue here.  *See* DLSE Opinion 2008.07.07, dated July 7, 2008; DLSE Opinion 2008.07.07–2, dated July 7, 2008.  While DLSE opinion letters are not entitled to deference, district courts have looked to them as a source of persuasive authority.  *See Cardenas v. McLane FoodServices, Inc.,* 796 F. Supp. 2d 1246, 1251–52 (C.D. Cal. 2011).  The Court grants Plaintiff's request for judicial notice of these opinion letters, attached as Exhibit A and B to Plaintiff's Request for Judicial Notice.  A court may take judicial notice of "matters of public record."  *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) (citing *MGIC Indem. Corp. v. Weisman,* 803 F.2d 500, 504 (9th Cir. 1986)).

b.  Plaintiff's Classes

Pace identifies two classes based on a list of employees who resigned or were terminated during the class period (the "Class List").  PetSmart provided this list by spreadsheet during discovery.  The Class List shows individual identifiers for all putative class members during the class period, the termination date for each, the last day on which any money was paid to the putative class member, the putative class member's authorized payment option, and whether the putative class member was paid terminating wages by paycard.  *See* Glenville Dep. 130, 167-169, 175.  Pace has identified individuals who were paid via paycard without authorization as individuals who were paid on a paycard but whose authorized payment method is designated direct deposit or live check.  Pace has also identified individuals who received their terminating wages late by comparing the termination date for each employee to the date of most recent payment.

Pace seeks certification of two classes.  First, Pace seeks certification of the "Late Pay Class," comprised of:

> All employees who were employed by Defendant in the State of California at any time from February 20, 2010, through the present, whose employment was separated for any reason (voluntary or involuntary), including without limitation, resignation, termination, and/or lay-off, and who were paid any wages more than 72 hours/3 days after an employee's last date of employment.

Mot. at 11.  Second, Pace seeks certification of the "Money Network Paycard Class," comprised of:

> All former employees who were employed by Defendants in the State of California at any time from February 20, 2010, through the present, who during their employment received their normal payroll wages through check or direct deposit, but upon their separation of employment received their terminating wages in the form of a Money Network Paycard.

*Id*.

c.  PetSmart's Termination Procedures and Databases

-4-

### i. Payment Method

During the class period, PetSmart offered employees three options for receiving wages: live check, direct deposit, or the ATM-like "Money Network Paycard." *See* Glenville Dep. at 42, 49. The default payment method is live check, and an employee must submit a specific authorization form to be paid by direct deposit or Money Network Paycard. *See* Glenville Dep. 42-43, 47, 57.

When an employee is terminated or resigns, however, PetSmart always pays out the final owed wages on a Money Network Paycard, even if the authorized method of pay is direct deposit or live check. *See id*. at 169. To access funds on a paycard, employees can use the card like an ATM card to withdraw funds or pay for items. *Id*. at 59-60. An employee can also use the three blank checks that are distributed with the paycard. *Id*. There are fees associated with both methods. *See id*. at 92, Ex. 56.

### ii. Termination Date and Payment Timing

PetSmart's precise policies on employee separation and termination dates are difficult to discern. First, there is limited evidence on PetSmart's official policies and recordkeeping for departing employees. PetSmart's Rule 30(b)(6) expert Dayna Reum testified that the date of termination for a California employee could be ascertained from the database in question. *See* Reum Dep. at 75. PetSmart's other Rule 30(b)(6) expert, Tammy Glenville, testified that PetSmart has a "general policy" of processing all separations, whether voluntary with notice, voluntary without notice, or involuntary, in the same way. For all of these separations, PetSmart uses the same "pay adjustment process." *See* Glenville Dep. at 168-69. This process includes filling out an "Emergency Payment Request" form and issuing a Money Network paycard kit. *See id*. All other details of this process, however, remain unclear to the Court.

Second, the database system that PetSmart uses to record termination dates relies on manual inputs from store managers. *See* Reum Decl. ¶ 6. The Class List in this case pulls termination dates from the "Last Date Worked" field in PetSmart's payroll software. *Id*. ¶ 9. The "Last Day Worked" is recorded by a store manager, and reflects only the employee's last day *worked*, which may not be their actual date of termination. *Id*. ¶¶ 9, 11. The database also

includes an "Effective Date" field, "which is supposed to reflect the effective date of one's separation." *Id.* ¶ 7. However, the field automatically adopts the date for the day on which the termination data was entered, and will stay that way unless the manager manually corrects it. *Id.* With respect to both fields, the system records the actual "termination date" as the following day, as this is the day the employee is actually ineligible for benefits. *Id.* ¶¶ 7, 9. When PetSmart provided discovery, it used the "Last Day Worked" field to supply the "termination date." The result is that "the 'termination dates' listed on the spreadsheet may or may not be the actual termination dates for each associate because the information is dependent on what date a manager inputted" as the employee's termination date. *Id.* ¶ 10.

Compounding this confusion is the fact that declarations from PetSmart managers in California suggest that at least some PetSmart managers do not appear to follow any systematic method of determining or recording an employee's termination date. In fact, the managers have widely divergent methods for determining and entering an employee's termination date. These methods include: (1) entering the last date the employee worked as their termination date in the HR system, Boone Decl. ¶ 4; (2) recording an employee's termination date as the date the employee indicates as his or her last day of work, Contreras Decl. ¶ 4; (3) entering a fired employee's termination date as "the associate's last day worked, which is a date earlier than the date on which a decision was made to terminate his or her employment," Cushman Decl. ¶ 5; (4) tendering payment to resigning employees on their last day of work Dabrowski Decl. ¶ 4; (5) when an employee stops coming to work, recording their termination date as "the second shift for which the employee failed to report to work, . . . which usually predates the processing of the employee's separation by a day or more," Dabrowski Decl. ¶ 5; and (6) letting a departing employee who gives notice receive their final wages via direct deposit on the next scheduled pay date, Alles Decl. ¶¶ 4-5, Hooks Decl. ¶ 5.

Pace objects to these declarations because the managers were not previously disclosed as witnesses. Plaintiff did not have the opportunity to depose or otherwise investigate these individuals and objects to submission of their declarations. The Court agrees with PetSmart, however, that aspects of Plaintiff's Late Pay Class were not apparent on the face of the Second

Amended Complaint, and so PetSmart could not have known until Plaintiff's motion for class certification that these questions would be relevant.  It is therefore understandable that PetSmart was forced to respond at this stage of the litigation and excusable.

## II.     Legal Standard

Courts may certify a class action only if it satisfies all four requirements identified in Federal Rule of Civil Procedure 23(a), and satisfies one of the three subdivisions of Rule 23(b). *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 614 (1997).  First, Plaintiffs must show the following: (1) the class is so numerous that joinder of all members individually is "impracticable;" (2) there are questions of law or fact common to the class; (3) the claims or defenses of the class representatives are typical of the claims or defenses of the class; and (4) the person representing the class is able to fairly and adequately protect the interests of all class members.  Fed. R. Civ. P. 23(a); *Staton v. Boeing Co.*, 327 F.3d 938, 953 (9th Cir. 2003); *accord United Steel, Paper & Forestry, Rubber, Mfg. Energy, Allied Indus. & Serv. Workers Int'l Union, AFL-CIO v. Conoco Phillips Co.*, 593 F.3d 802, 806 (9th Cir. 2010) (identifying the four requirements of Rule 23(a) as "numerosity," "commonality," "typicality," and "adequacy"). Second, under Rule 23(b)(3), Plaintiffs must show that common questions of law or fact predominate, and class resolution is superior to other available methods of resolution.  Fed. R. Civ. P. 23(b)(3).

A party seeking class certification must affirmatively demonstrate compliance with Rule 23—that is, the party must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact.  *Wal–Mart Stores, Inc. v. Dukes,* —— U.S. ——, 131 S.Ct. 2541, 2550, 2551 (2011).  The party may not rest on mere allegations, but must provide facts to satisfy these requirements.  *Doninger v. Pac. Northwest Bell, Inc.,* 564 F.2d 1304, 1309 (9th Cir. 1977).  A class certification motion requires a district court to conduct a "rigorous analysis" that frequently "will entail some overlap with the merits of the plaintiff's underlying claim."  *Wal–Mart,* 131 S. Ct. at 2550.  However, neither "the possibility that a plaintiff will be unable to prove his allegations, nor the possibility that the later course of the suit might unforeseeably prove the original decision to certify the class wrong, is a basis for declining to

certify a class which apparently satisfies [Rule 23]." *United Steel Workers*, 593 F.3d at 809. "[N]othing in either the language or history of Rule 23 . . . gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action." *Id.* (quoting *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177–78 (1974)).

The decision to grant or deny a motion for class certification is committed to the trial court's broad discretion. *Bateman v. American Multi–Cinema, Inc.*, 623 F.3d 708, 712 (9th Cir. 2010).

**III.    Discussion**

     a.   Rule 23(a)

          i.   Rule 23(a)(1): Numerosity

Under Rule 23(a)(1), a class must be "so numerous that joinder of all members is impractical." Fed. R. Civ. P. 23(a)(1).  A proposed class of at least forty members presumptively satisfies the numerosity requirement. *See Jordan v. Los Angeles County,* 669 F.2d 1311, 1319 (9th Cir. 1982), *vacated on other grounds by County of Los Angeles v. Jordan,* 459 U.S. 810 (1982); *Slaven v. BP America, Inc.,* 190 F.R.D. 649, 654 (C.D. Cal. 2000).  From the Class List, Pace has identified 823 members of the Money Network Paycard Class and 5,388 members of the Late Pay Class.  *See* Lee Decl. Ex. C, D.  Defendants do not dispute that this satisfies the numerosity requirement.  Pace has met the requirements of Rule 23(a)(1) for both classes.

          ii.   Rule 23(a)(2): Commonality

The "commonality" prerequisite mandates that there be "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2). Commonality requires that the class's claims are based on a "common contention . . . capable of classwide resolution," meaning that determination of the "truth or falsity" of that contention "will resolve an issue that is central to the validity of [the class's] claims." *Wal–Mart*, 131 S. Ct. at 2551.

In *Wal-Mart*, The Supreme Court emphasized that commonality requires that the class members' claims "depend upon a common contention" such that "determination of its truth or falsity will resolve an issue that is central to the validity of each claim in one stroke." *Mazza v.*

*Am. Honda Motor Co.,* 666 F.3d 581, 588 (9th Cir. 2012) (quoting *Wal–Mart,* 131 S. Ct. at 2551) (internal alteration omitted).  The sole question is not whether the plaintiffs have raised common questions, "even in droves," but rather, whether class treatment will "generate common *answers* apt to drive the resolution of the litigation."  *Wal–Mart,* 131 S. Ct. at 2551 (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof,* 84 N.Y.U. L. Rev. 97, 132 (2009)) (emphasis added) (internal quotation marks and alteration omitted).  "This does not, however, mean that *every* question of law or fact must be common to the class; all that Rule 23(a)(2) requires is 'a single *significant* question of law or fact.'" *Abdullah v. U.S. Sec. Associates, Inc.*, 731 F.3d 952, 957 (9th Cir. 2013) (quoting *Mazza,* 666 F.3d at 589 (emphasis added)).

### 1.   The Money Network Paycard Class

Pace claims the following common question satisfies the commonality requirement for the Money Network Paycard Class: Is defendant's policy and practice of payment of wage via Money Network Paycard lawful when an employee has not authorized payment of wages in that manner?

PetSmart's only argument opposing commonality for the Money Network Paycard Class is that the question whether an employee expressly requested final pay tendered in a manner other than a paycard is a question for individual determination.  The legal question, however, is actually whether PetSmart violates §§ 212 and 213(d) by distributing a paycard kit to an employee who did not specifically authorize a paycard, not whether that employee expressly asked for a payment form that was not a paycard.  PetSmart's records track which mode of payment its employees select, making this question appropriate for class determination.  Whether the paycard kits are legally sufficient is a common question satisfying the requirements of Rule 23(a).

### 2.   The Late Pay Class

Pace alleges the following common question for the late pay class: Does Defendant's common practice of paying final wages more than 3 days after the last date of employment violate Labor Code §§ 201-203?

PetSmart argues there are significant individual questions that preclude class certification, particularly its good faith defense.  PetSmart claims that this defense must be determined on an individual basis, requiring an inquiry into: (1) whether the employee refused payment in the manner tendered; (2) whether an employee requested to be paid his or her wages by his or her preferred method; (3) whether an employee gave notice; (4) when PetSmart had notice of resignation; (5) whether an employee came to work on his or her last scheduled work day; and (6) whether the employee absented herself from payment.

Under California law, a departing employee must be paid all earned wages on the employee's last date of employment.  If the employee quits and does not give at least 72 hours' notice, the employer has up to 72 hours after the last date of employment to pay final wages.  *See* Cal. Lab. Code §§ 201-202.  PetSmart's arguments are based on its affirmative defenses, which are more appropriately addressed when discussing predominance.  Plaintiffs have identified over 5,000 putative class members who received some form of payment more than three days from their termination date.  Whether PetSmart had policies in place that caused these employees to receive their terminating wages late in violation of California law is a common question capable of determination at the class level.  PetSmart's objections are more properly addressed in the predominance analysis.  *See Avilez v. Pinkerton Gov't Servs.*, 286 F.R.D. 450, 462 (C.D. Cal. 2012).

### iii.  Rule 23(a)(3): Typicality

"The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Ellis v. Costco Wholesale Corp.,* 657 F.3d 970, 984 (9th Cir. 2011) (quotation marks omitted). "Typicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought." *Id.*  The typicality requirement demands that a named plaintiff's claims be "reasonably co-extensive with those of absent class members," although "they need not be substantially identical." *Hanlon*, 150 F.3d at 1020.

Pace's claims are typical.  Pace was paid with a paycard despite her election to be paid by direct deposit, and was paid outside the required period for termination pay.  These are the same harms of the putative class members.  The only objection raised by PetSmart is a half-hearted reference to Pace's "apparent" inability to use a check.  This does not alter the nature of Pace's claims or their cause.  The Court therefore sees no reason to find Pace's claims atypical.  The typicality requirement is satisfied.

### iv.   Rule 23(a)(4): Adequacy

An adequate representative is one who will "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  Due process requires that absent class members have an adequate representative.  *See Hansberry v. Lee,* 311 U.S. 32, 43 (1940).  A representative is adequate where: (1) there is no conflict of interest between the representative and its counsel and absent class members, and (2) the representative and its counsel will "pursue the action vigorously on behalf of the class."  *Hanlon,* 150 F.3d at 1020 (internal citations and quotation marks omitted).

### 1.   Adequacy of the Named Representative

Pace has testified that she shares common interests with the classes, that her claims are typical, and that she is prepared to take all necessary steps to fairly and adequately represent the classes.  *See* Pace Decl. ¶¶ 5-7.  There are no evident conflicts between Pace and any class members.  *See id.*

PetSmart argues that Pace is inadequate because she "apparently is unable to use a check," she testified in her deposition that she does not know of any other former employee who was paid late, and does not know of any other former employee who received money through the "Money Pay Card Kit" who had not authorized it and/or had difficulty accessing the wages from the Money Pay Card Kit.  *See* Opp'n at 11.  None of this renders Pace inadequate.  Plaintiff need not have personal knowledge of other class members' experiences, and her lack of such knowledge does not create a conflict or raise doubts about her ability to vigorously pursue the action on behalf of the class.  *See Delagarza v. Tesoro Ref. & Mktg. Co.*, C-09-5803 EMC, 2011

WL 4017967 (N.D. Cal. Sept. 8, 2011); *Heffelfinger v. Elec. Data Systems Corp.,* No. CV 07–00101, 2008 WL 8128621, at *16 (C.D. Cal. Jan. 7, 2008).

PetSmart further argues that Pace is inadequate because she has a conflict with the former non-exempt employees in the class based on her objection to the *Moore* settlement in the Northern District. *See Moore et al. v. PetSmart et al.*, Case No. 5:12-cv-03577-EJD. The Northern District preliminarily approved the *Moore* settlement after the Court heard argument on this motion. *See* Defendant's Request for Judicial Notice (Dkt. 56). Pace filed an objection to the preliminary approval of the settlement in *Moore*. *See Moore v. PetSmart*, Objection (Dkt. 44). Pace objected to the fact that if plaintiffs' counsel in *Moore* was not awarded the full requested 33.3% of the settlement, the remainder would revert to PetSmart. *See* Objection at 1. Pace also objected to the request for fees as "exorbitant," and objected to the attempt to settle a claim under §§ 201-203. *Id.* at 2-3. Finally, Pace objected to the scope of the release (any pled and unpled claim) and the size of the incentive awards requested. *Id.* at 4.

PetSmart argues that because Pace objected to the *Moore* settlement, she has a conflict with the members of this class also included in the *Moore* class whose potential recovery she is preventing; she has "placed class members in this case at risk without reasonable regard for their rights that she may be adversely impacting through her objections." *See* Opp'n at 12. Furthermore, PetSmart argues, Pace must obtain permission from the Northern District to withdraw her objections in the *Moore* litigation to proceed in this litigation.

PetSmart cites no authority for the position that prosecuting a separate class action on different claims while objecting in a similar but separate action renders a class representative inadequate. Pace is a member of the *Moore* class. It is not clear to the Court why this should render her inadequate to represent this class. PetSmart's argument hinges on the fact that Plaintiff is disrupting a sure payment in *Moore* that is likely to be higher than any payment in this class. Doing this, PetSmart argues, shows that Plaintiff is not acting in the best interests of the members of this class.

But the *Moore* claims do not mirror the claims in this case. The *Moore* case does address a late wage payment claim, but does so as a derivative claim from other violations of

California's wage laws.  There is no overlap with the determination of whether the paycard kits violate California law.  As the Court notes below, the Late Pay Class will not be certified, even further reducing any overlap with *Moore*.  Furthermore, Pace objected to aspects of the *Moore* settlement that were troubling, but did not dispute the settlement in principle.  To the extent that the claims in this case are affected by the release of claims in *Moore*, that question can be adjudicated on a class-wide level at summary judgment.  There is no suggestion that payments in the *Moore* settlement or in this case would bankrupt PetSmart such that the other class could not obtain relief.  *See Sullivan v. Chase Inv. Servs. of Boston, Inc.*, 79 F.R.D. 246, 258 (N.D. Cal. 1978).  Because PetSmart's arguments are unconvincing, and the Court sees no other evidence of a conflict or other disincentive in the record, the Court finds that Pace is an adequate representative under Rule 23.

## 2.   Adequacy of Counsel

Plaintiff's counsel are experienced class action attorneys and have both served as class counsel in previous wage and hour class actions.  *See* Lee Decl. ¶¶ 5-7; Huyn Decl. ¶¶ 5-6. Plaintiff's counsel have taken the deposition of Defendant's 30(b)(6) witnesses on multiple occasions, participated in the discovery process, and have pursued matters in law and motion as deemed necessary.  *See* Lee Decl. ¶ 9; Hyun Decl.¶ 8.  Plaintiff's counsel's only relationship with Plaintiff is the attorney-client relationship in this matter.  *See* Lee Decl. ¶ 10; Hyun Decl.¶ 9.  Accordingly, Plaintiff's Counsel are adequate and will vigorously prosecute the action.  *See* Lee Decl. ¶ 8; Hyun Decl. ¶ 7.

### b.   Rule 23(b)

#### i.   Rule 23(b): Predominance

The predominance inquiry "tests whether proposed class actions are sufficiently cohesive to warrant adjudication by representation," a standard "far more demanding" than the commonality requirement of Rule 23(a).  *Amchem*, 521 U.S. at 623–24. However, predominance may exist even where there is "some variation among the individual employees, as well as some potential difficulty in proof."  *Local Joint Executive Bd. of Culinary/Bartender Trust Fund v.*

*Las Vegas Sands, Inc.,* 244 F.3d 1152, 1162 (9th Cir. 2001) (certifying class of employees, despite some variation in proof as to whether individuals would be entitled to backpay).

Courts "have traditionally been reluctant to deny class action status" as failing the predominance requirement of Rule 23(b)(3) "simply because affirmative defenses may be available against individual members." *See Lorber v. Beebe,* 407 F. Supp. 279, 294 (S.D.N.Y.1975); *Kelly v. City & County of San Francisco,* C 05–1287 SI, 2005 WL 3113065 (N.D. Cal. Nov. 21, 2005) ("Unique affirmative defenses that require some individualized inquiry do not present a per se bar to certification."); 7AA Fed. Prac. & Proc. Civ. § 1778 (3d ed.) ("[T]he action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members.").

### 1.  Late Pay Class

PetSmart raises several challenges to the Late Pay Class on predominance grounds. These objections fall into roughly three categories: (1) there are individual issues surrounding tendering payment; (2) employees often do not give notice when they depart PetSmart, causing difficulties in tracking departure dates and in tendering final pay; and (3) PetSmart has individual good faith defenses that require individual determinations.

Generally, PetSmart's arguments are minimally persuasive.  First, PetSmart argues that the individualized questions surrounding the logistics of an employee's separation—whether an employee appeared for tender or provided a mailing address, whether an employee gave notice, etc.—defeat predominance.  Under California law, an employer must tender payment either at the place of discharge or at the office where the employee performed labor, depending on the type of termination.  Cal. Lab. Code § 208.  The employer may not mail a final check unless an employee "expressly exercise[s]" this option.  *Villafuerte v. Inter–Con Sec. Sys., Inc.,* 96 Cal. App. 4th Supp. 45, 51 (2002); Cal. Lab. Code § 202.  A quitting employee who does not appear to receive a final check must either return to the place of employment to retrieve payment, or give seventy-two hours' notice.  *See* DLSE Op. Ltr. 1986.09.15; *see also In re Wal-Mart Stores, Inc. Wage & Hour Litig.*, 2008 U.S. Dist. LEXIS 14756, 24-25 (N.D. Cal. Feb. 12, 2008).

PetSmart argues that it is impossible to know from the data whether employees provided notice, appeared for tender, provided a mailing address, and so forth.  The limited evidence in this case, however, suggests that PetSmart's own recordkeeping process and policies on this issue are inconsistent at best, and do not track the necessary information to make this determination.  PetSmart then used this incomplete data to produce a spreadsheet using an inferior database field.  From all of this, PetSmart asks the Court to determine that the true problem here is rogue employees who simply do not appear for work.  The Court is very troubled that PetSmart attempts to rely on its own inept recordkeeping and discovery practices to evade accountability for potentially illegal payment practices.

But Plaintiff provides no genuine rejoinder, other than a halfhearted (unsupported) argument that PetSmart is required to keep these records and a minimal citation to *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946).  The *Anderson* case itself addresses proving damages in the context of the Fair Labor Standards Act, but California courts have adopted and applied its burden-shifting principles to California Labor Code violations.  *See, e.g., Amaral v. Cintas Corp. No. 2*, 163 Cal. App. 4th 1157, 1189 (2008).  It is not entirely clear how Plaintiff believes the Court should apply the *Anderson* rule in the context of class certification on a liability issue, however.  The Court acknowledges that such an argument could prove persuasive, but Plaintiff has not actually presented one.

Second, PetSmart argues that its good faith defense defeats predominance because it has an individual defense as to each employee.  This argument is also weak.  "Willful" under § 203 means "that an employer has intentionally failed or refused to perform an act which was required to be done," such as intentionally failing to pay final wages when they are due.  *See Amaral*, 163 Cal. App. 4th at 1201.  "The employer's refusal to pay need not be based on a deliberate evil purpose to defraud workmen of wages which the employer knows to be due."  *Id.* "[A] good faith dispute that any wages are due will preclude imposition of waiting time penalties under Section 203.  A 'good faith dispute' that any wages are due occurs when an employer presents a defense, based in law or fact which, if successful, would preclude any recovery on the part of the employee."  8 Cal. Code. Reg. § 13520.

Arguments that PetSmart had a genuine desire to accommodate employees or that it did its best to comply are not defenses to willfulness. Rather, a good faith dispute focuses on whether "any wages are due," and is a defense based on law or fact. Notably, PetSmart does not allege or describe any good faith defenses likely to apply to any of the class members here. Rather, PetSmart seems to focus its efforts on whether it withheld wages in bad faith or for bad reasons; but this is not the proper inquiry. There is no evidence of a good faith dispute regarding whether the wages that were eventually paid to PetSmart's employees were delayed due to a good faith dispute over whether they were owed. In this regard, the Court declines to adopt the analysis of *In re Taco Bell Wage & Hour Actions*, 1:07-CV-01314-OWW, 2011 WL 4479730 (E.D. Cal. Sept. 26, 2011).

Although PetSmart's challenges are minor, they still prevail against the evidence and arguments Pace presents in this case. Pace states baldly that: "[I]t is undisputed that Defendant has uniform practices and policies which resulted in Labor Code violations. In other words, each of the claims is predicated on common uniform policies and practices making Plaintiff's claims ideally suited for class action treatment." Mot. at 16. But with respect to the late payment of final wages, Pace provides no *evidence* to support this theory. There is no evidence of how PetSmart determines an employee's last day, how managers are directed to use the company software, how managers are instructed to distribute final wages, or any similar information. The deposition excerpts Pace presents do not discuss how termination dates are decided or recorded, nor how different managers might record such information. Rather, they focus entirely on the fact that employee are paid via ATM card. Instead, Pace points only to the Class List. Certainly the Class List is strong evidence that PetSmart frequently does not pay out final wages in a timely manner. But Pace is claiming a blatant and uniform practice or policy, and there is no evidence of what that practice or policy entails.

If Pace had articulated an argument that PetSmart's failure to create a uniform policy, delegation of total authority to its managers, or inconsistent record-keeping policies were causing widespread Labor Code violations, there might be an identifiable theory amenable to classwide determination. *See McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672

F.3d 482, 488 (7th Cir. 2012) *cert. denied,* 133 S. Ct. 338 (U.S. 2012) (reversing denial of class certification where company's specific policies of delegating certain decisions exacerbated racial discrimination). Indeed, the evidence suggests significant failings on PetSmart's part. But Pace has not argued that PetSmart's inconsistent reporting, poor record-keeping, or unclear termination guidelines are causing late payments. Plaintiff instead chose to present the theory that PetSmart's "operations are standardized," but with no evidence to support this. The Court cannot determine that class issues predominate when there is no clear theory from which those class issues emerge.

The analyses in *Avilez* and *Abdullah* are not on point. Both of these cases addressed blanket meal-break policies (explained by affidavits from employees) that allegedly violated wage-and-hour laws. *See Abdullah*, 731 F.3d at 964; *Avilez*, 286 F.R.D. at 467. The affirmative defenses claimed by the defendants were standardized and applied class-wide, addressing whether the defendants had appropriately invoked a "nature of the work" exception. These allegations might be applicable here if the PetSmart's allegedly uniform policy were concretely identified, but that is simply not the case. Notably, Pace cites no cases approving a class premised on a late wage payment when those wage payments are not the result of other Labor Code violations.

The Court therefore faces weak opposition to predominance, but also no clear argument or basis of proof from which to judge class-wide issues. The Court is unable to pull a cogent theory out of this factual slurry. On this basis, then, Pace has failed to meet her burden to show that individual issues predominate by failing to enunciate a viable theory or provide any evidence whatsoever to support her claims regarding the defendant's "uniform" policy. The Late Pay Class claims are not appropriate for class treatment as alleged and presented on the record before this Court.

## 2. Money Network Paycard Class

The Money Network Paycard Class presents a much more straightforward predominance question. The question of whether the kits PetSmart distributes to all departing employees upon termination or resignation satisfy California law is a class-wide question addressing a uniform

PetSmart policy.  Most of PetSmart's objections to this class are merits questions addressing whether the checks included with the paycard satisfy California requirements.  *See* Opp'n at 18-19.  These questions are not proper considerations at this stage.  *See Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 487 (C.D. Cal. 2012) (citing *Ellis v. Costco Wholesale Corp.,* 657 F.3d 970, 983 (9th Cir. 2011)) ("It is well established that a plaintiff's purported likelihood to lose on the merits is an impermissible basis for denying class certification.").

More appropriate for this analysis are PetSmart's arguments that the question of authorization is an individual determination precluding certification.  PetSmart argues that whether any employee authorized payment via ATM card requires an individual determination for each class member.  PetSmart provides no actual evidence in support of this claim, and its own records directly oppose its position.  Employees are asked to select a method of payment upon their employment, and PetSmart records this choice in its database.  There is no evidence that any other method of authorization is used to change this preference.  Even if a few such individual questions existed, they do not defeat the significant class-wide questions regarding whether the paycard kits satisfy California law.  *See* 7AA  Wright & Miller, Fed. Prac. & Proc. Civ. § 1778 (3d ed.) ("Therefore, when one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) . . . .").  Class questions therefore predominate.

### ii.  Rule 23(b): Superiority

The second prong of the analysis under Rule 23(b)(3) also requires a finding that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3).  Here, "[g]iven the small size of each class member's claim, class treatment is not merely the superior, but the only manner in which to ensure fair and efficient adjudication of the present action."  *See Bruno v. Quten Research Inst., LLC,* 280 F.R.D. 524, 537 (C.D. Cal. 2011) *reconsideration denied,* 280 F.R.D. 540 (C.D. Cal. 2012).  Indeed, "[w]here it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits for damages, aggrieved persons may be without any effective redress unless they may employ the class action device."  *Deposit Guar. Nat'l. Bank v.*

*Roper*, 445 U.S. 326, 339 (1980).  Furthermore, each member of the class pursuing a claim individually would burden the judiciary, which is contrary to the goals of efficiency and judicial economy advanced by Rule 23.  *See Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 946 (9th Cir. 2009) ("The overarching focus remains whether trial by class representation would further the goals of efficiency and judicial economy.").

In evaluating superiority, courts often consider the four factors listed in Rule 23(b)(3): "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action."  Fed. R. Civ. P. 23(b)(3); *see* Newberg on Class Actions § 4:64 (5th ed.).

Because the Court concluded that the Late Pay Class did not meet the predominance requirement, there is no need to address superiority.  The Court therefore analyzes only the Money Network Paycard Class.

There are several advantages to class litigation in this case.  First, significant common questions can be resolved without every PetSmart employee presenting an individual claim.  The Court disagrees with PetSmart that California Berman hearings can provide a better vehicle for resolution of these claims.  Berman hearings are a form of administrative relief permitting an employee to file an administrative wage claim against an employer.  *See Sonic-Calabasas A, Inc. v. Moreno*, 57 Cal. 4th 1109, 1128 (2013).  Although Berman hearings have the advantage of efficiency and affordability, there are several significant disadvantages.  *See Bell v. Farmers Ins. Exch.*, 115 Cal. App. 4th 715, 745 (2004).  Berman hearings are still individual, do not provide the opportunity for attorneys' fees (and thus limit plaintiffs' access to counsel), and can present a risk of overburdening the DLSE.  *Id.*  In this case, the efficiency interests of resolving a large number of issues simultaneously outweigh any advantage that individual Berman hearings present.

The Court also rejects PetSmart's contention that participation in the *Moore* settlement would provide an alternative to the instant lawsuit.  The *Moore* settlement does not address the

propriety of the money paycard kits.  Any possible overlap with the *Moore* suit through the Late Pay Class is now extinguished, and putative class members cannot recover anything for PetSmart's potentially improper payment methods through the *Moore* settlement.  The Court finds that trial management questions are not overwhelming and that class litigation is the superior method of litigation for the claims of the Money Network Paycard Class.

## IV.  Disposition

In light of the foregoing, the Court GRANTS IN PART Plaintiff's motion and certifies the Money Network Paycard Class.

The Court DENIES IN PART Plaintiff's motion and denies certification of the Late Pay Class.

The Court appoints Mr. Huyn and Mr. Lee as class counsel.


DATED:       June 3, 2014

_David O. Carter_

_____
DAVID O. CARTER
UNITED STATES DISTRICT JUDGE